# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **JORGE GUTIERREZ** | § | |
| | § | |
| **V.** | § | **A-16-CA-488-LY** |
| | § | |
| **LORIE DAVIS** | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

TO:    THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates.

Petitioner is represented by counsel and has paid the full filing fee for this case. Before the Court are Petitioner's Application for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Document 1) and Brief in Support of Petition for a Writ of Habeas Corpus (Document 2), Respondent's Answer with Brief in Support (Document 7), and Petitioner's Reply (Document 8). For the reasons set forth below, the undersigned recommends that Petitioner's Application for Writ of Habeas Corpus be **denied**.

## STATEMENT OF THE CASE

Respondent has custody of Petitioner pursuant to a judgment and sentence imposed by the 167th District Court of Travis County, Texas. A jury found Petitioner guilty of capital murder and the trial court imposed the statutory sentence of life imprisonment without parole. Petitioner

contends he is entitled to federal habeas relief because he was denied his right to the effective assistance of trial counsel.

## BACKGROUND

### A.      Factual background

The Texas Court of Appeals did not specify a statement of facts in its decision denying Petitioner's appeal. *Gutierrez v State*, 2013 WL 4822923 (Tex. App.–Austin 2013, pet. ref'd). The following facts are quoted from the State's brief in Petitioner's state habeas proceedings:

> On May 31, 2010, Sergeant Scott Crowe received a call of shots fired at 3:17 a.m. at a business known as the Pink Monkey. (RR VII: 39). He arrived at the scene within 7 minutes of the call and found two victims on the ground. (RR VII: 40). One victim, Arturo Rodriguez, was located south of the business building, and another victim, Jose Hernandez, was just to the right of the front door of the business laying on the curbside. (RR VII: 40). . . . . Jose appeared to already be deceased. (RR VII: 43-44).
>
> Crowe observed a shell casing and a projectile on the ground next to this second victim. (RR VII: 44-45). To the right of the entrance to the Pink Monkey, Crowe found shell casings for a .380 caliber gun and 9 millimeter. (RR VII: 50). He also found pieces of belt, belt buckle, and piece of leather attached to the buckle. (RR VII: 50; SX6). Crowe found another shell casing for a 9 millimeter in some pea gravel near the victim south of the building. (RR VII: 51; SX8). Witnesses reported to Crowe that the suspect had left the scene in a vehicle. (RR VII: 51; SX8). . . . Crowe also learned that the night manager for the club, Ryan Dorer, had fired a gun at some point during the evening, but Crowe did not locate that weapon. (RR VII: 67). Based on the number of casings at the scene, Crowe determined that the .380 was fired four times and the 9 millimeter was fired at least four times. (RR VII: 71-72).
>
> Dorer testified that after the club closed that night, a security guard informed him that there was an altercation in the parking lot. (RR VII: 85). In the parking lot, Dorer encountered two groups of people, about 4 or 5 in each group, bickering and calling each other names. . . .
>
> Raul Hernandez, the brother of the two victims killed in this shooting, testified that the fight began between two girls arguing over a cell phone. (RR VIII: 102). One of the girls accused the victim named Jose of stealing the cell phone,

which angered him. (RR VIII: 102). The other victim, Arturo, had actually picked up the phone off the ground. As Arturo was handing it over, one of the men with applicant snatched the phone from Arturo's hand. (RR VIII: 102-103). A fight broke out between the two groups. (RR VII: 104).

. . .The argument escalated into a fist fight between about 8 people; one person, who had driven the get-away car, took off his "big cowboy belt" and swung it at and hit Jose. (RR VII: 87-88). In Dorer's words, Jose was "getting his butt kicked." (RR VII: 88).

. . . Dorer went to the back of the property where a female employee gave him what he thought was a "starter pistol" and told him to shoot it to break up the fight. (RR VII: 88-89). Dorer twice fired two shots into the air, but the fighting continued. (RR VII: 89-90). Dorer gave the gun back to the female employee and began screaming that the cops were coming; the fighting stopped, and everyone "started going their own way." (RR VII: 90).

Dorer started walking toward the front door of the club and toward Jose when he heard someone say "he has got a gun." (RR VII: 90-91). Dorer looked and saw applicant (Dorer identified applicant in the courtroom) walking toward him and Jose with a big silver gun in his hand. (RR VII: 91). Dorer testified that applicant was coming out of a truck with the "big gun" in his hand. (RR VII: 91). Applicant's friends stood in front of him and tried to stop him. (RR VII: 91-92). But, applicant pushed through his friends, walked up to Jose and shot him. (RR VII: 92).

Dorer described the events immediately before applicant shot Jose. Jose had his back turned as applicant approached. (RR VII: 92). Jose turned around, saw the gun in applicant's hand, and then tried to turn again but applicant shot him. (RR VII: 92) Dorer was only 10 feet away. (RR VII: 92). Dorer never saw a weapon in Jose's hands. (RR VII: 93).

The surveillance video from the Pink Monkey showing the incident was admitted into evidence and played for the jury. (RR VII: 95-96; SX13A). While watching the video, Dorer explained that everybody ran for their cars after applicant shot Jose. (RR VII: 100). Applicant ran back to the truck, but the person with him that night did not want applicant to get back into the truck. (RR VII: 101). Applicant then walked from the truck with the gun in his hand and shot Arturo, Jose's brother. (RR VII: 101-102). Applicant shot Arturo a second time as Arturo was running away. (RR VII: 102).

Dorer never saw a weapon in either Jose's or Arturo's hands. (RR VII: 104). Jose did not pose any threat to applicant when he shot him; in fact, Jose was walking away. (RR VII: 104). And, Arturo did not pose any threat of physical harm to

applicant when he shot Arturo. (RR VII: 104). Arturo was sitting in a car and then running away when applicant twice shot him. (RR VII: 104). Dorer never aimed his small pistol at applicant, and he never saw anyone threaten applicant with any kind of weapon. (RR VII: 103-104). Dorer testified that applicant could have left the scene before shooting the brothers, but he didn't. (RR VII: 102-103). Asked to describe applicant's demeanor during the incident, Dorer stated that applicant "was totally calm. Like it was nothing. It was really scary." (RR VII: 104-105).

Nichole Teaney arrived at the Pink Monkey about 2:30 a.m. to pick up her sister who was a waitress at the club. (RR VII: 163). She was talking to some men in the parking lot when she saw two females fighting. (RR VII: 164). Teaney got out of the car to record with her phone the females fighting, but then some guys started fighting with fists and belts. (RR VII; 166-167). The club manager fired into the air to stop the fighting. (RR VII: 168). Teaney recalled applicant going to his truck, getting his gun, and shooting Jose who was not armed. (RR VII: 169-171). She also saw applicant shoot Arturo, who was also unarmed, and then calmly walk away. (RR VII: 171, 172-173) (Teaney testified that Arturo was still wearing his belt when he was shot, so he was not one of the men fighting with a belt.) (RR VII: 200).

Sergeant Craig Smith of the Travis County Sheriff's Office was the lead detective in this case. (RR VII: 228). Smith explained for the jury how investigations into a case proceeded. (RR VII: 233). He explained that murder cases start out as "deceased person" cases while each lead is pursued, witnesses are investigated, and evidence is collected. (RR VII: 233-234). The investigation includes following any information or [indications] of self-defense. (RR VII: 234). Smith interviewed applicant in his office after applicant was pulled from the truck that fled the scene. (RR VII: 231-232). Applicant had on a ripped shirt but no significant injuries to his face or person. (RR VII: 232-233). The evidence collected in this case did not appear to be self-defense. (RR VII: 234).

\*\*\*

. . . The night of this capital murder, [Pedro] Solis arrived at the club about 11 p.m. or midnight. (RR VII: 264). Solis observed Jose in an altercation with applicant. (RR VII: 266-267). There were about 8 people involved in the fight, four on four. Jose, Arturo, and two friends were on the same side of the fight. (RR VII: 267). Solis testified that Jose's and Arturo's friends started the fight with applicant's friends, but applicant and his friends "absolutely decimated" them. (RR VII: 268). Solis tried to break up the fight, and he pulled two of applicant's friends off Jose. (RR VII: 268). Jose then swung at Solis, but Solis took him down and began to walk away. (RR VII: 268).

At this point, the fighting was over, but Solis saw applicant take a gun from the backseat of the truck. (RR VII: 268-270). In fact, Jose [] was walking back toward the club. (RR VII: 270). As applicant walked by Solis, applicant's gun accidentally discharged, and a ricochet fragment hit Solis in the leg. (RR VII: 270). Applicant acknowledged "my bad," and Solis was shocked by applicant's nonchalance with just having struck him with a round. (RR VII: 270, 272). Then applicant fired two shots at Jose who had his back to applicant and was walking away. (RR VII: 272-273). Applicant walked back toward his truck but he took a shot at Arturo as Arturo went to get his car. (RR VII: 273). . .

Solis testified that applicant then trotted back to this truck and drove away "like he just ordered a pizza." (RR VII: 274). He described it as "the most cool, calm, collected situation [he had] ever seen." (RR VII: 274). Solis stated that he had friends in the military with 18 years' experience doing special operations and special forces who were not as calm as applicant after shooting someone. (RR VII: 274). Solis cautioned that he was not testifying that applicant's shootings were premeditated, but, in his opinion, it wasn't applicant's "first rodeo." (RR VII: 274).

Solis never saw Jose or Arturo with a weapon. (RR VII: 275). Neither Jose nor Arturo posed any physical threat to applicant at the time of the shooting. (RR VII: 275). In fact, Arturo was by the building, running away from the situation when applicant shot him. (RR VII: 275; RR VIII: 45-46).

Deputy John Lopez with the Travis County Sheriff's Office responded to the shots fired call at the Pink Monkey. (RR VIII: 141). While in route, Lopez received a description of the suspect vehicle, a white F-250 pickup. (RR VIII: 142). Lopez noticed a vehicle matching that descriptions and pursued it. (RR VIII: 144). As Lopez began to pursue the vehicle, it changed direction and began to increase its speed. (RR VIII: 144). Lopez noticed the vehicle lost control and swerve[d] on the road, a flash came out of the driver's side, and it smelled like a gun had been fired. (RR VIII: 145). Lopez thought someone had fired at him. (RR VIII: 146).

The suspect vehicle eventually stopped, and Lopez ordered the occupants to stick their hands out the windows. (RR VIII: 148). The driver and passenger both put their hands out initially, but the passenger's hands kept going in and out [of] the window. (RR VIII: 148). Once back up arrived, Lopez was able to take the occupants of the vehicle into custody. (RR VIII: 150). . . . The passenger was identified as applicant. (RR VIII: 153). A black triangular gun case (SX 25) fell out of the vehicle as applicant exited it. (RR VIII: 151-152). Lopez was struck with how calm applicant appeared. (RR VIII: 169).

5

Lopez then walked to the area where he had smelled the odor of a fired weapon. (RR VIII: 154). Lopez found a shiny pistol on the roadway. (RR VIII: 154). Lopez described the pistol as a 9 mm Beretta . . .

The medical examiner testified as to the manner and cause of death of both victims. Jose suffered three gunshot wounds to his head, upper right arm, and his back. (RR VIII: 245). The gunshot wound to his head was just below his right eye and apparently travelled into his mouth. (RR VIII: 245, 247). The gunshot wound to his upper arm went through his arm and reentered his body on the right side of his back. (RR VIII: 247-248). The bullet travelled through Jose's right lung, his aorta, left lung, and then exited the left side of his chest. (RR VIII: 248). This gunshot severely damaged the aorta and caused significant internal bleeding. (RR VIII: 247-248). . . . The medical examiner determined that the cause of Jose's death was multiple gunshot wounds and the manner of his death was a homicide. (RR VIII: 262-263).

Arturo came to the medical examiner from the hospital where multiple life-saving procedures had been attempted. (RR VIII: 263). Arturo suffered one gunshot wound to his left thigh. (RR VIII: 264). The gunshot travelled back to front, angling [from] left to right. (RR VIII: 267). The gunshot entered from the back of the thigh and severed both his femoral artery and left femoral vein. (RR VIII: 264). . . . He died of a gunshot wound to his thigh, and the manner of death was homicide. (RR VIII: 269).

Document 6, Exh. 17 at 10-21.

## B.    Petitioner's state court proceedings

A grand jury indictment returned August 11, 2010, charged Petitioner with capital murder, alleging that he killed two people during the same criminal transaction. *Id.*, Exh. 11 at 5.  Petitioner was represented by retained counsel in his criminal proceedings. Document 5, Exh. 14 at 13. The State noticed that it would not seek the death penalty. *Id.*, Exh. 6 at 6. The State offered Petitioner a plea bargain of 60 years' imprisonment, which he declined. *Id.*

All of the witnesses testified that two or three shots were fired by Mr. Dorer before Petitioner retrieved his gun from the truck. *Id.*, Exh. 11 at 56. Two witnesses related to the victims testified that, just before the shooting of the two men, "[w]e were going to try to leave at the end because the

cops were going to get there." *Id.*, Exh. 11 at 57, 107. These witnesses testified that, other than Mr.

Dorer and Petitioner, no one was armed. *Id.*, Exh. 11 at 57, 105. The two witnesses who were related

to the victims testified that, just before he was shot, " [Jose] was about to square up again, like he

put his hands up, and I guess he seen the gun, and . . .that is when he got shot." *Id.*, Exh. 11 at 58,

108 (Petitioner came toward them "but we couldn't see the gun yet, so then he shot to the ground

and then that is when my brother is like he was like getting ready to fight him again, but then when

he saw he shot the ground, my brother like turned around, and that is when he like he aimed at him

and he shot him."). The victims' brother testified, in response to the question: "And what was Jose

doing when the defendant raised the gun to shoot him," that "He was getting ready to put his hands

up to fight." *Id.*, Exh. 11 at 108. In response to the question: "And once Jose saw the gun or once

both of you saw the gun, what did you do," this witness answered "We were trying to run." *Id.*

Petitioner's brother, and a female friend who witnessed the fight preceding the shooting,

testified at his trial. *Id.*, Exh. 12 at 146-213. Petitioner's brother testified that they were attacked

outside the bar by several men. *Id.*, Exh. 12 at 80. The brother testified that, after a lull in the fight,

Petitioner assessed his brother's injuries:

> Q.     So you testified that when he grabbed your face, that it was bleeding?
>
> A.     Yes.
>
> Q.     He said what?
>
> A.     They got you.
>
> Q.     And what did he do after that? I don't want to know what he said after that. What did he do after that?
>
> A.     He takes the gun and he cocks it twice, two full bullets fall into the ground, and then he shoots one into the floor.

Q.     Was anybody facing him? Was he – was anybody yelling at him or telling him anything as he was doing that, screaming or anything going on?

A.     Yes. The other guys were – they were pretty close, maybe like 10 feet, and they were still like – they had their hands up and they were yelling cuss words like bitch, you ain't going to do shit. It was just a whole bunch of people.

Q.     Did your brother appear calm at that time?

A.     No.

Q.     And were you calm?

A.     No, sir.

Q.     Was Iris calm?

A.     I don't think so.

Q.     And so what happens next?

A.     So that is when she comes and she tries to pull them. They are still yelling at him and like they keep on getting closer. That is when he takes a step and he shoots the first guy.

                                        ***

A.     Well, it was really fast, but I saw who he was shooting at.

Q.     Okay. Was that person that he shot one of the persons that was involved in the fight?

A.     Yes, sir, it was the main guy that started everything.

                                        ***

Q.     Did somebody flick a cigarette in his face?

A.     Yes, sir.

Q.     Do you know who it was that flicked the cigarette in his face?

A.     Yes.

Q. Who was the one that flicked the cigarette in his face?

A. It was some guy wearing a black shirt.

Q. Do you know if it was the same guy that got shot first or not?

A. No, sir.

*Id.*, Exh. 12 at 187-88, 190. Petitioner's brother reiterated that Petitioner had first fired a "warning shot into the ground." *Id.*, Exh. 12 at 193. The defense also called two female cousins of Petitioner, who testified that Petitioner was not the instigator of the melee and that they left the scene before the victims were shot. *Id.*, Exh. 12 at 67, 147. The defense also called a forensic expert to testify regarding the trajectory of the bullet which killed the second victim. *Id.*, Exh. 12 at 218-63.

After presenting its case and after some testimony had been introduced by the defense, the State:

> essentially [conceded] the first aggressor issue in the sense that we don't want to present any evidence on it and we are not going to argue against it. We are not going to claim that either of the . . . victims was not the first aggressor. . . . in terms of starting the brawl.

*Id.*, Exh. 13 at 5-6.

The jury was given a charge that included an instruction on capital murder, an instruction on murder, and the law of self-defense. Document 6, Exh. 11 at 6-15. With regard to the charge to the jury, the defense argued "we would object that the charge contains no provisions for a finding of manslaughter, and we are asking that a charge of manslaughter be included in the charge in addition to what we have there." Document 5, Exh. 13 at 9-10. The State argued that a manslaughter charge would be inconsistent with the evidence introduced at trial. *Id.*, Exh. 13 at 10. The trial court determined:

based on the evidence before the Court, there is – we have included murder both ways in the lesser included, and I don't see where that has been raised or where there is a theory that has been presented where that would be appropriate or reasonable given the evidence, so I am going to deny that.

*Id.* The charge included these instructions:

Now, therefore, bearing in mind the foregoing instructions and definitions, if you believe from the evidence beyond a reasonable doubt that the defendant, Jorge Gutierrez, on or about the 31st day of May, 2010, in the County of Travis, and State of Texas, did then and there intentionally or knowingly cause the death of Jose Arroyo Hernandez, by shooting him with a firearm, and did then and there intentionally or knowingly cause the death of another individual, namely, Arturo Rodriguez, by shooting him with a firearm, as alleged in the indictment; but you further find from the evidence, or have a reasonable doubt thereof, that the defendant reasonably believed as viewed from his standpoint alone that deadly force when and to the degree used, if it was, was immediately necessary to protect himself against the use or attempted use of unlawful deadly force by the said Jose Arroyo Hernandez and/or Arturo Rodriguez, you will acquit the defendant and say by your verdict "not guilty."

ln summary, if, and only if, you find beyond a reasonable doubt that the defendant intentionally caused the death of both Jose Arroyo Hernandez and Arturo Rodriguez and you further find beyond a reasonable doubt that the defendant was not justified in using deadly force to defend himself against any use or attempted use of unlawful deadly force by Jose Arroyo Hernandez and the defendant was not justified in using deadly force to defend himself against any use or attempted use of unlawful deadly force by Arturo Rodriguez, you will convict the defendant of capital murder. If you do not so find beyond a reasonable doubt, you will say by your verdict "not guilty" and proceed to consider the charges of murder as set out below.

Proceed to consider paragraphs 8 and 9 only if you have found the defendant "not guilty" of capital murder. Otherwise, proceed to paragraph 10.

Document 6, Exh. 11 at 9-10. The jury found Petitioner guilty of capital murder. *Id.*, Exh. 11 at 16.

The state trial court imposed the mandatory sentence of life imprisonment without the possibility of parole. *Id.*, Exh. 11 at 21.[1]

---

[1] After being indicted but prior to his trial in this matter, Petitioner was convicted in the United States District Court for the Eastern District of Virginia for the offense of conspiracy to distribute five (5) kilograms or more of cocaine, and was sentenced to a prison term of 235 months, to be served concurrently

Petitioner appealed his conviction and sentence. Petitioner's retained counsel filed an *Anders* brief in his appeal. Document 5, Exh. 1. Petitioner argued in a pro se pleading that his attorneys were prevented from the intelligent exercise of peremptory strikes of the venire panel because they were not provided with the addresses of potential jurors until the day of trial. Document 6, Exh. 11 at 25-26. The conviction and sentence were affirmed. *Gutierrez v. State*, 2013 WL 4822923, at *1 (Tex. App.–Austin 2013, pet. ref'd). The Court of Criminal Appeals refused a petition for discretionary review. *Id.* The United States Supreme Court denied Petitioner's petition for a writ of certiorari. *Gutierrez v. Texas*, 134 S. Ct. (2014).

Petitioner, through counsel, filed an application for a state writ of habeas corpus. Document 6, Exh. 11 at 29-107. Petitioner alleged he was denied the effective assistance of counsel. *Id.*, Exh. 11 at 60, 63, 64, 66, 68, 70-72. Petitioner also asserted a claim that the state's capital punishment statute, as applied to Petitioner, was unconstitutional. *Id.*, Exh. 11 at 74.

Petitioner's lead trial counsel filed an affidavit in the state habeas matter, averring:

Mr. Gutierrez was charged with capital murder for killing Jose Hernandez and Arturo Rodriguez during the same transaction []. The court instructed the jury on self-defense with regard to each death []. I argued that Mr. Gutierrez had a legal right to shoot the men because they were trying to hurt him and that the jury should acquit him based on self-defense [].

OPINION TESTIMONY

Sergeant Craig Smith, the lead detective, testified without objection on direct examination that, although he is open-minded regarding self-defense, he saw no evidence of self-defense in this case [].

Pedro Solis, a civilian who was present during the incident, testified without objection on direct examination that Mr. Gutierrez was very calm when he left in his truck and, in Solis' opinion, ". . . this wasn't his first rodeo" []. . . .

---

with his sentence of life imprisonment in this matter. Document 5, Exh. 6 at 4-5 & Exh. 15 at 14-21. *See also Gutierrez v. McNeils*, No. 1:14 CV 00211 LY, at Document 1, Exh. 1 at 4.

The defense did not file a motion in limine or object to the detective's opinion testimony that he saw no evidence of self-defense; . . . and to lay opinion testimony that "this wasn't [Mr. Gutierrez's] first rodeo." Neither expert nor lay opinion testimony of this nature is admissible. I routinely file a motion in limine in a murder case to exc1ude . . . police opinion testimony suggesting that the defendant is guilty. There was no reason not to file a motion in limine to exclude these references in Mr. Gutierrez's case and, if necessary, to object to this testimony. The failure to do so was inadvertent rather than strategic.

## THE JURY INSTRUCTION ON MURDER

The court instructed the jury that it could consider the lesser included offense of murder only if it found Mr. Gutierrez not guilty of capital murder []. The prosecutor's final argument and the verdict form were both consistent with this instruction []. The defense did not object to the jury instruction, the argument, or the verdict form.

It was my understanding at the time of trial that Texas law does not require a jury to acquit the defendant of the charged offense before it can consider any lesser included offenses in the court's charge. Rather, if the jury cannot reach a verdict on the charged offense, it can consider the lesser included offenses. I believe that the court incorrectly instructed the jury that it had to acquit Mr. Gutierrez of capital murder before it could consider murder.

The defense should have objected to this incorrect instruction. The failure to do so was inadvertent rather than strategic.

## CHALLENGING THE CONSTITUTIONALITY OF THE STATUTE

I understood at the time of trial that Texas law provided that a person commits murder pursuant to § 19.02(b) of the Penal Code if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. The offense has a maximum punishment of life imprisonment (with parole eligibility in 30 years). I knew that, pursuant to § 19.02(d), a defendant convicted of murder could raise at the punishment stage the issue of whether he caused the death under the immediate influence of sudden passion arising from an adequate cause; if he proved by a preponderance of the evidence that he did, the offense is a second degree felony with a maximum punishment of 20 years in prison.

Mr. Gutierrez was charged with capital murder under § 19.03(a)(7)(A) of the Penal Code because he allegedly murdered two men during the same transaction. Because the State did not seek the death penalty, if he were convicted, he would be sentenced automatically to life without parole pursuant to § 12.3l(a) of the Penal Code. The defense did not consider that a defendant who kills one or more persons

in the same transaction under the immediate influence of sudden passion arising from an adequate cause should not automatically receive life without parole. *We did not consider filing a motion challenging the constitutionality, facially or as applied, of § 19.03(a)(7)(A) on the grounds that it would deny due process of law and/or constitute cruel and unusual punishment to automatically impose life without parole without allowing the jury to decide whether the defendant killed one or both persons under the immediate influence of sudden passion arising from an adequate cause.* We should have argued that § 19.03(a)(7) is unconstitutional because it requires an automatic sentence of life without parole for the murders of two persons in the same transaction even if the defendant killed one or both of them under the immediate influence of sudden passion arising from an adequate cause.

The deceaseds (sic) and their companions instigated the altercation and struck Mr. Gutierrez and his companions with fists and belts. Mr. Hernandez flicked a lit cigarette at Mr. Gutierrez before Mr. Gutierrez went to his truck and retrieved a gun. Given the opportunity, the jury reasonably could have found that he killed either or both men under the immediate influence of sudden passion arising from an adequate cause. In retrospect, we should have filed a motion challenging the constitutionality of the statute, facially and as applied, and requested a special issue at the guilt-innocence stage (and, if denied, renewed the request upon receipt of the verdict) with regard to each death. We should have considered the relevant statutes more carefully and preserved these issues for appeal. The failure to do so was inadvertent rather than strategic.

*Id.*, Exh. 11 at 88, 93-97 (emphasis added and internal citations to the record omitted).

The State filed an answer to the petition for state habeas relief, with proposed findings of fact and conclusions of law. *Id.*, Exh. 17 at 4-7. The State asserted, *inter alia*, that counsel's performance was not unconstitutionally ineffective because "the evidence did not raise sudden passion arising from an adequate cause." *Id.*, Exh. 20 at 9. The state trial court issued an order adopting the State's findings of fact and conclusions of law and denying habeas relief. *Id.*, Exh. 18.

6.    The court finds that applicant has made multiple allegations of ineffective assistance of counsel in his writ application. The court concludes that *Strickland v. Washington*, 466 U.S. 668 (1985) is the appropriate standard of review of these claims. . . .

7.    The court concludes that, even if Mr. Martinez's failure to object to various testimony and the court's charge constituted a deficient performance,

applicant did not suffer any prejudice therefrom given the facts of this offense.

***

10.     The court concludes that the issues of "sudden passion" and "adequate cause" were not raised by the evidence in this capital murder trial.

11.     The court finds applicant did not challenge the constitutionality of the capital murder scheme at trial or on direct appeal.

12.     The court concludes defense counsel did not render ineffective assistance of counsel by failing to challenge in the trial court the constitutionality of the capital murder scheme because the issues of "sudden passion" and "adequate cause" were not raised by the evidence in this cause.

13.     Based on the record in this cause, the court concludes that applicant has failed to meet his burden under *Strickland v. Washington*, and applicant has therefore failed to show that he is entitled to relief.

14.     The court concludes that the constitutionality of the capital murder scheme, raised by applicant in his second ground for relief, is not cognizable via an application for writ of habeas corpus where it was not raised in the trial court or on direct appeal. *Ex parte Boyd*, 58 S.W.3d 134 (Tex. Crim. App. 1998).

*Id.*, Exh. 17 at 5-7.

Petitioner filed objections to the trial court's findings of fact and conclusions of law. *Id.*, Exh. 20. Petitioner supplemented his habeas pleadings, alleging that his trial counsel rendered ineffective assistance by failing to impeach Mr. Solis with his prior statements to the police. *Id.*, Exh. 19 at 5. The Texas Court of Criminal Appeals denied the application without written order. *Id.*, Exh. 5.

**C.      Petitioner's federal habeas claims**

Petitioner alleges he is entitled to federal habeas relief because he was denied the effective assistance of trial counsel. Petitioner argues his counsel's performance was unconstitutionally deficient because counsel failed to:

1. file a motion in limine and object to the lead detective's opinion that there was no evidence of self-defense;

2. object when a lay witness opined that this was not Petitioner's "first rodeo;"

3. impeach the state's key witness, Mr. Solis, with his prior statements to the police;

4. object to the jury charge, which indicated that the jury had to acquit Petitioner of capital murder before it could consider the lesser-included offense of murder; and

5. make an as-applied challenge to the constitutionality of Texas's capital punishment scheme because there was evidence that Petitioner committed the murders under the immediate influence of sudden passion.

Document 2 at 19-32.

Petitioner notes the Texas Court of Criminal Appeals did not adopt the trial court's findings of fact and conclusions of law in denying relief in Petitioner's state habeas action. *Id.* at 12-13. Accordingly, Petitioner argues, the Court must apply a de novo standard of review to Petitioner's claims. Respondent maintains that, because the Texas Court of Criminal Appeals' decision was an adjudication on the merits of Petitioner's claims, "[r]eview here, then, is not de novo but under 28 U.S.C. § 2254(d)." Document 7 at 14.

## ANALYSIS

### A. The Antiterrorism and Effective Death Penalty Act of 1996

The Supreme Court summarized the basic principles established by the Court's many cases interpreting the 1996 Antiterrorism and Effective Death Penalty Act in *Harrington v. Richter*, 562 U.S. 86, 97–100 (2011). The Supreme Court noted that the starting point for any federal court reviewing a state conviction is 28 U.S.C. § 2254, which states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Court stated that "[b]y its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington*, 562 U.S. at 98.

One of the issues *Harrington* resolved was "whether § 2254(d) applies when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Id.* The deference due to a state court decision under § 2554(d) "does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* (citations omitted). The Supreme Court reaffirmed that "a state court need not cite nor even be aware of our cases under § 2254(d)" for its opinion to be entitled to deference. *Id.*, *citing Early v. Packer*, 537 U.S. 3, 8 (2002). When a state court decision denying relief is unexplained, the habeas petitioner's burden is to show there was "no reasonable basis for the state court to deny relief." *Id.*

Section 2254(d) permits the granting of federal habeas relief in only three circumstances: (1) when the state court's decision "was contrary to" federal law as clearly established by the holdings of the Supreme Court; (2) when the state court's decision involved an "unreasonable application" of such law; or (3) when the decision "was based on an unreasonable determination of the facts" in light of the record before the state court. *Id.* at 100, *citing* 28 U.S.C. § 2254(d), *and*

*Williams v. Taylor*, 529 U.S. 362, 412 (2000). Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Mitchell v. Esparza*, 540 U.S. 12, 10 (2003).

Under the unreasonable application clause of § 2254(d), a federal court may grant the writ "if the state court identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000) (quotation and citation omitted). A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). *See also Premo v. Moore*, 562 U.S. 115, 123 (2011) ("The Court of Appeals was wrong to accord scant deference to counsel's judgment, and doubly wrong to conclude it would have been unreasonable to find that the defense attorney qualified as counsel for Sixth Amendment purposes.").

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings.[] It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Harrington*, 562 U.S. at 102-03 (internal citations omitted). The Supreme Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may

be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Grim v. Fisher*, 816 F.3d 296, 304 (5th Cir.), *cert. denied*, 137 S. Ct. 211 (2016) (internal quotations omitted).

The provision of § 2254 which allows the granting of federal habeas relief when the state court made an unreasonable determination of the facts is limited by the next section of the statute, § 2254(e). Section 2254(e)(1) requires a federal court to presume state court factual determinations to be correct, although a petitioner can rebut the presumption by clear and convincing evidence. This presumption extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006). Absent a showing of clear and convincing evidence, the federal court must give deference to the state court's factual findings. 28 U.S.C. § 2254(e)(1); *Ward v. Stephens*, 777 F.3d 250, 256 (5th Cir.), *cert. denied*, 136 S. Ct. 86 (2015). Additionally, "[t]he Supreme Court has clarified that when a claim is adjudicated on the merits, for the purposes of review under § 2254(d)(1), the record is limited to the one before the state court, even if the state court issued a summary affirmance." *Hoffman v. Cain*, 752 F.3d 430, 437 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1160 (2015).

This standard of review applies to Petitioner's federal habeas claims notwithstanding the fact that the Texas Court of Criminal Appeals' decision denying relief in Petitioner's state habeas action was unexplained and did not adopt the trial court's findings of fact and conclusions of law. Although the state court did not make explicit findings, that does not mean the court "merely arrived at a legal conclusion" unworthy of the presumption of correctness. *Cantu v. Collins*, 967 F.2d 1006, 1015 (5th Cir. 1992), *citing Marshall v. Lonberger*, 459 U.S. 422, 433-34 (1983). If a state court summarily denies a petitioner's claim, the Court's authority under AEDPA is limited to determining the

reasonableness of the ultimate decision. *Charles v. Thaler*, 629 F.3d 494, 498-09 (5th Cir. 2011);

*Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002).

> As this Court has explained, "[i]t seems clear to us that a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc).

> [W]e conclude that our focus on the "unreasonable application" test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence. The latter approach appears unduly formalistic considering that the federal habeas court has the full record before it and is competent to determine whether *Strickland* has been unreasonably applied to the case before it.

> *Id.*

> Here, as in *Neal*, "[t]he precise question, then, is whether the [state] court's ultimate conclusion-that there was no prejudice and, consequently, no ineffective assistance of counsel under the *Strickland* test-is objectively unreasonable." [*Id.*] "The statute compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001).

*Pondexter v. Dretke*, 346 F.3d 142, 148-49 (5th Cir. 2003).

The state court's decision was an adjudication on the merits. *Salazar v. Dretke*, 419 F.3d 384,

398-99 (5th Cir. 2005); *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex Parte Grigsby*,

137 S.W.3d 673, 674 (Tex. Crim. App. 2004); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim.

App. 1997) ("In our writ jurisprudence, a 'denial' signifies that we addressed and rejected the merits

of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons

unrelated to the claim's merits."). When state habeas relief is denied without an opinion, this Court

must assume that the state court applied the proper "clearly established Federal law," and then

determine whether the state court decision was "contrary to" or "an objectively unreasonable application of" that law. *Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003).

**B.     The *Strickland* standard is applicable.**

Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Accordingly, to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that counsel's representation fell below an objective standard of reasonableness and a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* When deciding whether counsel's performance was deficient, the Court must apply a standard of objective reasonableness, mindful that judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 686-89. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under

the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation omitted).

The deference to state court determinations of a petitioner's claims is heightened when the petitioner asserts a *Strickland* claim. To be entitled to habeas relief,

> [t]he state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 572 U.S. ___, 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014) (internal quotation marks omitted). When the claim at issue is one for ineffective assistance of counsel, mo reover, AEDPA review is "doubly deferential," *Cullen v. Pinholster*, 563 U.S. 170, 190, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment . . ."

*Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016).

The prejudice prong of *Strickland* provides for federal habeas relief only if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S.. at 694. "'The likelihood of a different result must be substantial, not just conceivable.'" *Trevino v. Davis*, 829 F.3d 328, 351 (5th Cir. 2016), *quoting Brown v. Thaler*, 684 F.3d 482, 491 (5th Cir. 2012). Counsel's performance cannot be considered deficient or prejudicial if counsel fails to raise a non-meritorious argument. *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007); *Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006). Additionally, if a state appellate court found evidence to be admissible pursuant to state rules, or it found a claim based on state law without merit, counsel's failure to object to the admission of the evidence or their failure to assert the claim is not prejudicial because federal habeas courts are to review state court misapplications of federal law, and the Court may not rule that a state court

incorrectly interpreted its own law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013); *Charles*, 629 F.3d 500-01 ("Because the state determined that [the] testimony was permissible lay opinion under state evidentiary law . . . a federal habeas court may not conclude otherwise.").

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008). And the deferential review standards of the AEDPA also require the Court to presume the correctness of the state court's factual findings unless they are rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007).

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Harrington*, 562 U.S. at 102. Accordingly, when evaluating Petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded Petitioner's complaints about his counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle*, 343 F.3d at 444.

### C.    Analysis

#### 1.    Motion in limine

Petitioner contends his trial counsel's performance was unconstitutionally ineffective because counsel did not file a "motion in limine and, if necessary, object to the prejudicial opinion testimony

of an experienced homicide sergeant that petitioner was not defending himself." Document 2 at 21.

This claim is based on a single statement from the lead police investigator, Sergeant Smith:

> Q.     In this case as the guy who collects all the evidence, did you see any evidence
> that appeared to be self defense?
>
> A.     It did not appear to me to be so, no.

Document 5, Exh. 10 at 234. Petitioner contends that the sergeant's opinion "that he saw no evidence

to support self-defense constitutes the functional equivalent of his opinion that petitioner was guilty.

Police opinion testimony suggesting that the defendant is guilty is inadmissible." Document 2 at 20,

*citing Boyde v. State*, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974).[2] With regard to prejudice,

Petitioner contends: "The lead detective's opinion that there was no evidence to support self-defense

undoubtedly had a profound effect on the jury." *Id.* at 25.

Contrary to his affidavit in Petitioner's state habeas action, defense counsel did file two

motions in limine, which were both granted by the trial court. Document 5, Exh. 2 at 37-41, 105-06;

---

[2] In *Boyde*, the objectionable questioning was as follows:

Q. (By Mr. Gay) Officer, I will ask you if at the time you made your investigation and made the arrest in this case, you were totally satisfied with (sic) the Defendant, Marvin Boyde, was guilty of this murder?

Appellant's objection to the question was sustained, the court instructed the jury to disregard the question, and appellant's motion for mistrial was overruled. Despite the court's ruling, the prosecutor then asked:

Q. (By Mr. Gay) Officer, do you know of any evidence in this case known to you which would tend to exonerate or show that the Defendant, Marvin, Boyde, is not guilty of this offense?

Appellant's objection to this question was sustained, and instruction to the jury to disregard same was given by the court.

*Boyde*, 513 S.W.2d at 590.

Exh. 9 at 4. Respondent allows that, arguably, the sergeant's testimony violated the portion of the original motion in limine prohibiting the State from "trying to bring in obviously inadmissible evidence," or the portion of that motion addressing statements going to the defendant's mental state. Document 7 at 20. Respondent allows that the statement could be viewed as violating the second motion in limine, which prohibited witnesses from volunteering inadmissible testimony depriving the defendant of the opportunity to object. *Id.* However, Respondent contends that this testimony was otherwise admissible, citing *James v. State*, 335 S.W.3d 719 (Tex. App.–Fort Worth 2011, no pet.).

In *James*, the following testimony of a police officer was found admissible by the Texas Court of Appeals:

> Q. (BY [Prosecutor]) Ma'am, did the defendant's claim of self-defense make any sense to you based on what you saw?
>
> [Defense Counsel]: Objection, Your Honor. It's asking for an opinion and a conclusion based on things that apparently aren't in evidence at this time.
>
> THE COURT: Overruled.
>
> A. No, sir.

*Id.* at 725. The appellate court held that this testimony "was admissible under rule 701 because it was rationally based on events that [the officer] perceived." *Id.* at 726.[3]

---

[3]     The complained-of question specifically inquired about the sense of James's self-defense assertion in light of Officer Fletcher's observations. The State did not ask Officer Fletcher to opine on the truthfulness of another witness's testimony, to opine on the truthfulness of James's assertion of self-defense, to opine whether James was guilty, or to even opine on James's credibility, thus possibly encroaching upon the jury's province to make credibility determinations. Instead, the question inquired about the logical force of James' assertion in light of what Officer Fletcher had personally observed.

*James*, 335 S.W.3d at 726.

The Texas Court of Appeals' decision that trial counsel's performance was not deficient was not an unreasonable application of *Strickland*. The single statement at issue was more like the testimony in *James* than the objectionable questioning in *Boyde*, i.e., it was not a direct opinion as to the defendant's guilt. The appellate court could reasonably have found the challenged statement by Sergeant Smith was admissible – Texas law allows that a person may offer an opinion as a lay witness if it is based on the perception of that person and helpful to the determination of a fact in issue. Tex. R. Evid. 701; *Fairow v. State*, 943 S.W.2d 895, 899 (Tex. Crim. App. 1997) (collecting cases); *Roberson v. State*, 100 S.W.3d 36, 39 (Tex. Ct. App.–Waco 2002, pet. ref'd). Although Petitioner's trial counsel states in his affidavit that the failure to object to this evidence was inadvertence rather than strategy, counsel also erroneously avers he did not file a motion in limine. Counsel could have reasonably believed that the law permitted this evidence, *Givens v. Cockrell*, 265 F.3d 306, 309 (5th Cir. 2001) (finding no deficient performance in failure to object where the status of the law on point was not entirely clear), or counsel could have made a strategic decision not to object to the statement, which strategic decision is "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91; *Charles*, 629 F.3d at 502 (decision not to object to adverse witness testimony was not an unreasonable strategy when doing so would draw the jury's attention to that testimony).

Regardless of whether it was deficient performance to fail to object to this statement, Petitioner has not established that he was prejudiced by the admission of this testimony given the weight of all of the testimony presented at trial. *Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003) ("The comment Cotton complains of was 'an isolated comment in a sea of evidence' incriminating him for Epstein's murder," *quoting Montoya v. Collins*, 955 F.2d 279, 287 (5th Cir.

1992)); *Norris v. Davis*, 826 F.3d 821, 835 (5th Cir. 2016) ("Norris cannot show *Strickland* prejudice in light of the overwhelming evidence of his guilt."), *cert. denied*, 137 S. Ct. 1203 (2017) .

Because trial counsel's failure to object to this statement was not deficient performance or prejudicial, the state court's decision denying relief was not an unreasonable application of *Strickland* and Petitioner is not entitled to habeas relief on this claim.

### 2. Solis' testimony

The Texas Court of Criminal Appeals' decision that this omission did not constitute ineffective assistance of counsel was not an unreasonable application of *Strickland*. As noted by Respondent:

> The record suggests that counsel's inadvertence to object may have been a result of not understanding the answer. After Solis opined that this was not applicant's "first rodeo," the court reporter asked him "first what?" as she obviously did not clearly hear the testimony. [] Perhaps defense counsel, and even the jury, did not hear Solis' answer. And, the record does not reflect what Solis meant by "first rodeo," i.e. did he mean the first time applicant engaged in a fight, fired a weapon, or shot a person.

Document 6, Exh. 17 (State's response in Petitioner's state habeas action) at 27-28.

Regardless of whether the failure to object was deficient performance, there was no prejudice arising from allowing this testimony to go unchallenged. This witness was not a friend of Petitioner and, accordingly, he had no basis for knowledge of any previous criminal history, as compared to a police officer or the State, whom the jurors could have inferred would have knowledge of a criminal history. Additionally, this particular statement was cumulative of this witness's other testimony about Petitioner's calm demeanor, which was allowable testimony by an eye witness, and other witnesses' testimony that Petitioner was calm at the time of the shootings. Document 5, Exh. 10 at 105, 155 (Mr. Dorer said that Petitioner "was totally calm"); *Id.*, Exh. 10 at 173 (Ms. Teaney

testifying that Petitioner did not seem fearful or panicked).  Because the testimony was allowable

and cumulative, the state court's decision denying relief was not an unreasonable application of

*Strickland* and Petitioner is not entitled to habeas relief on this claim.

### 3. Failure to impeach Solis with his prior statements

The Texas Court of Appeals' decision denying relief on this claim was not an unreasonable

application of *Strickland* because defense counsel's alleged failure to impeach this witness was not

deficient performance or prejudicial.  Petitioner contends:

> The offense report reflects that Solis told the police that Hernandez was the instigator, was "running his fucking mouth," and flicked a lit cigarette at petitioner before the shooting []. He described Dorer as "an idiot for firing the gun," as it "instigated an even bigger disturbance." He also overheard one of petitioner's companions say in Spanish, "Fuck it, if they have guns, we have guns," just before petitioner obtained the gun. Martinez did not elicit these statements on cross-examination. Had he done so, the jury would have perceived Solis and the events much differently.

Document 2 at 24 (internal citation omitted). Petitioner does acknowledge that counsel:

> elicited on cross-examination that Solis could not say that he was "100 percent sober" because he had been drinking that day, that he did not deny telling the police that petitioner fired one shot at the ground and another at Hernandez's back, and that he did not see the second shooting.

*Id.* at 23-24.

Counsel's cross-examination of this witnesses was not below the prevailing professional

standard. Respondent correctly observes that Petitioner's counsel did elicit testimony from Mr. Solis

that Mr. Dorer's firing of a gun "escalated the situation." Document 5, Exh. 11 at 37. Defense

counsel did ask the question: "And as a matter of fact, you heard in response to those two gunshots

someone say they got guns, we got guns," which question drew a hearsay objection. *Id.*, Exh. 11 at

37. After a lengthy discussion, the trial court granted the objection. *Id.*, Exh. 11 at 37-40.

Additionally, defense counsel did impeach Mr. Solis' credibility,[4] and counsel was looking at the prior statement during cross-examination. *Id.*, Exh. 11 at 26 ("Let me show you that and have you take a look at that and ask you if you recognize that as the written statement you gave that night?"). Any alleged deficient performance in not raising more of Mr. Solis' prior statements was presumably strategic, as the report contained statements counsel would not have wanted the jury to hear, *inter alia*, his description of the killing as "cold-blooded murder." Document 6, Exh. 11 at 106. "[A] conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009).

Neither was the alleged failure to impeach Mr. Solis with his prior statements prejudicial. The other witnesses testified in accordance with Mr. Solis' testimony about the instigation of the fight, the panic caused by Mr. Dorer firing a weapon, and whether the victims were threatening Petitioner just prior to the time they were shot. And Mr. Solis agreed with defense counsel that Mr. Dorer's warning shots "didn't have the desired effect" and "escalated the situation." Document 5, Exh. 11 at 37. Furthermore, any testimony regarding who started the fight was ultimately irrelevant, as the parties stipulated that Mr. Hernandez was the "first aggressor." *Id.*, Exh. 13 at 5-6.

Counsel's questioning and limited impeachment of Mr. Solis was apparently strategic, and did not constitute deficient performance and was not prejudicial. Because the state court's decision

---

[4]This included asking him, "For example, you told Officer Pelt on the night an hour after the incident that you never saw the other person get shot by who or how. . . " and "Yesterday you testified that you saw the second individual get shot from a distance of 25 yards, but yet on the night in question when you were asked about the other person, you said that I don't know who got shot there or why or when or by who." Document 5, Exh. 11 at 27-28.

denying relief was not an unreasonable application of *Strickland*, Petitioner is not entitled to habeas relief on this claim.

### 4.     The jury charge

Petitioner contends counsel's performance was deficient because counsel did not object to "sequencing error in the charge." Document 2 at 25-27. As previously noted, after the instruction on capital murder, the charge advised:

> In summary, if, and only if, you find beyond a reasonable doubt that the defendant intentionally caused the death of both Jose Arroyo Hernandez and Arturo Rodriguez and you further find beyond a reasonable doubt that the defendant was not justified in using deadly force to defend himself against any use or attempted use of unlawful deadly force by Jose Arroyo Hernandez and the defendant was not justified in using deadly force to defend himself against any use or attempted use of unlawful deadly force by Arturo Rodriguez, you will convict the defendant of capital murder. If you do not so find beyond a reasonable doubt, you will say by your verdict "not guilty" and proceed to consider the charges of murder as set out below.
>
> Proceed to consider paragraphs 8 and 9 only if you have found the defendant "not guilty" of capital murder. Otherwise, proceed to paragraph 10.

Document 6, Exh. 11 at 9-10. Petitioner contends this charge improperly "instructed the jury that it had to acquit petitioner of capital murder before it could consider the lesser included offense of murder." Document 2 at 26. Petitioner raised this issue in his state habeas action, and the Texas Court of Criminal Appeals held that counsel was not unconstitutionally ineffective for failing to raise this claim of error. The State's brief in Petitioner's state habeas action, the State allowed that "[c]ounsel erred by failing to object to this instruction," while arguing that Petitioner failed to overcome the "strong presumption" that counsel's error was not prejudicial. Document 6, Exh. 17 at 33.

> Based on the record in this case, there is no reasonable probability that, but for counsel's failure to object to this single sentence in the court's charge, the result

of the proceeding would have been different. [] The court read the entire charge to the jury before the parties argued and before the jury retired to deliberate. [] Thus, the jurors heard the instructions on murder before deliberating and, therefore, knew it was an option. The State initially emphasized in its argument that, although there were two definitions for murder, the State had to prove the first definition that applicant intentionally and knowingly killed the two victims to prove capital murder. [] . . . By its verdict, the jury obviously resolved the self-defense issue against applicant.

*Id.* "The Sixth Amendment does not guarantee criminal defendants the right to error-free representation." *Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997). Even if counsel's performance was deficient, Petitioner must still establish prejudice arising from counsel's error. The Supreme Court has held:

> a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Strickland*, 466 U.S. at 698.

Petitioner has not established that he was prejudiced by this error, as the overwhelming weight of the evidence indicates that Petitioner was guilty of capital murder, i.e., that he calmly shot both victims without a well-founded belief that either victim was about to inflict substantial harm on Petitioner. In addition to testimony from several witnesses that neither of the victims was armed, several witnesses testified that Petitioner shot one victim as he was turning away from Petitioner, and then shot the other as he was running away from Petitioner. There was no reasonable probability that, but for the unchallenged jury instruction, the result of the proceeding would have been different, and Petitioner has not established a substantial likelihood of a different outcome. *Williams*, 529 U.S. at 398 (explaining that, when considering the prejudice prong of the *Strickland* test, the court

"correctly emphasized the strength of the prosecution evidence"); *Miller v. Dretke*, 404 F.3d 908, 919 (5th Cir. 2005) (concluding there was no reasonable probability that the petitioner would have been acquitted "in light of the other overwhelming evidence").

Because the state court's decision was not an unreasonable application of *Strickland*, Petitioner is not entitled to habeas relief on this claim.

### 5. Failure to challenge the capital punishment statute

Petitioner argues that counsel's performance was deficient and prejudicial because he failed to assert a claim:

> that the statutory punishment scheme for capital murder that requires a sentence of death or life without parole for a defendant who murdered two persons during the same transaction is unconstitutional as applied to a defendant who committed one or both murders under the immediate influence of sudden passion arising from an adequate cause.

Document 2 at 28.[5] Petitioner asserts that counsel erred by failing to preserve this error for appeal. *Id.* at 29. This issue was raised in Petitioner's state habeas action, and Petitioner contends that the trial court's conclusion that the evidence did not raise an issue of sudden passion arising from an adequate cause was "an unreasonable determination of the facts in light of the evidence presented."

---

[5] The relevant statute provides:

(a) An individual adjudged guilty of a capital felony in a case in which the state seeks the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for life without parole or by death. An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for:

***

(2) life without parole, if the individual committed the offense when 18 years of age or older.

Tex. Penal Code Ann. § 12.31.

*Id.* As evidence of sudden passion arising from an adequate cause, Petitioner notes the first victim

"flicked a lit cigarette in the face of petitioner or one of his friends;" that one of the victims'

"companions hit Javier, and another hit petitioner in the head when he tried to help;" that "the men

fought with their fists and belts;" and that Petitioner "felt intimidated" when Mr. Dorer fired shots

in the air and that he "obtained a pistol because he thought that the assailants were shooting at them."

*Id.* at 29-30. Petitioner also avers sudden passion arising from an adequate cause was demonstrated

because Mr. Hernandez was "squared off to fight," but then Petitioner states that he "shot Hernandez

in the side *as Hernandez turned away*." *Id.* (emphasis added).

"When a party makes an 'as applied' challenge to a statute, the essence of the challenge

asserts that the statute, although generally constitutional, operates unconstitutionally given the

challenging party's particular circumstance." *Collins v. State*, ___ S.W.3d ___, 2017 WL 1173815,

at *6 (Tex. Ct. App.–Beaumont 2017, no pet. h.).[6] In the State's response to Petitioner's state habeas

application, the State argued:

> Applicant contends that the statutory punishment scheme was
> unconstitutional as applied to him because the evidence raised sudden passion and
> the jury did not have a procedural vehicle to consider whether he killed either or both
> men under the immediate influence of sudden passion arising from an adequate
> cause. Applicant claims defense counsel rendered ineffective assistance of counsel
> by failing to challenge the constitutionality of Penal Code § 19.03(a)(7)(A), at trial.

---

[6] The failure to raise a facial challenge would not have constituted deficient performance:
[C]ounsel's failure to anticipate a rule of law that has yet to be articulated by the governing
courts, and failure to raise a novel argument based on admittedly unsettled legal questions
does not render his performance constitutionally ineffective. While the Constitution
guarantees criminal defendants a competent attorney, it does not insure that defense counsel
will recognize and raise every conceivable . . . claim.

*Ragland v. United States*, 756 F.3d 597, 601 (8th Cir. 2014) (internal quotations and citations omitted), *cited in Jones v. Davis*, ___ Fed. App. ___, 2016 WL 7187381, at *5 (5th Cir.), *petition for cert. filed*, No. 16-7876 (Feb. 9, 2017).

Applicant's claim is without merit because the evidence in this case did not raise "sudden passion" or "adequate cause." A murder committed under the "immediate influence of sudden passion arising from an adequate cause" is a second-degree felony offense rather than a first degree. [] Sudden passion is "passion directly caused by and arising out of provocation by the individual killed[,]" which arises at the time of the murder. V.T.C.A. Penal Code § 19.02(a)(1).

The defendant has the burden of production and persuasion with regard to the issue of sudden passion. Penal Code § 19.02(d). To justify an instruction on sudden passion in the jury charge at punishment, the record must "at least minimally support" an inference that (1) the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; and (2) his sudden passion was in fact induced by some provocation by the deceased or another acting with him, *which provocation would commonly produce such a passion in a person of ordinary temper; (3) he committed the murder before regaining his capacity for cool reflection*; and (4) a causal connection existed between the provocation, passion, and homicide. *Wooten v. State*, 400 S.W.3d 601 (Tex. Crim. App. 2013) . . . The mere fact that someone acts in response to provocation of another is not enough to support a sudden passion instruction. *Trevino v. State*, 100 S.W.3d 232, 241 (Tex. Crim. App. 2003). . . .

Document 6, Exh. 17 at 35-36 (emphasis added).

The Texas Court of Appeals' resolution of this claim was not contrary to or an unreasonable application of *Strickland*. The state court's decision was based on an interpretation of state law; the state court necessarily concluded that the failure to challenge the sentencing scheme was not deficient performance and/or that an as-applied challenge to the statute would have failed because Petitioner could not meet his burden of production or persuasion with regard to "sudden passion." Because the denial of relief on this claim was an interpretation of state law, that determination is entitled to complete deference by this Court. *Bradshaw*, 546 U.S. at 76; *Amador v. Quarterman*, 458 F.3d 397, 412 (5th Cir. 2006); *Fuhrman v. Dretke*, 442 F.3d 893, 901 (5th Cir. 2006); *Moore v. Quarterman*, 526 F. Supp. 2d 654, 687-88 (W.D. Tex. 2007). *Cf. Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004) ("However, the state habeas court . . . implicitly must necessarily have concluded that

Art. 28.061 is not unconstitutional under state law," a decision entitled to deference by the federal habeas court). *See also Wooten*, 400 S.W.3d at 609 ("It is highly unlikely that a jury that had already rejected the appellant's claim that he reasonably believed that deadly force was immediately necessary to defend himself would nevertheless find in his favor on the issue of sudden passion.").

Additionally, counsel's performance cannot be considered deficient or prejudicial if counsel fails to raise a non-meritorious argument. *Turner*, 481 F.3d at 298; *Parr*, 472 F.3d at 256. Under Texas law, "sudden passion" is an argument offered in mitigation of a sentence, rather than as a lesser-included offense. Tex. Penal Code An.. § 19.02(d). Accordingly, the argument that Petitioner should have been allowed to present evidence of "sudden passion" is an argument that Petitioner's rights were violated by the inability to present evidence to mitigate his sentence. The United States Supreme Court has held that the imposition of a mandatory life sentence without the opportunity to present mitigating circumstances does not violate the United States Constitution. *Harmelin v. Michigan*, 501 U.S. 957, 994-95 (1991). It is well-established that the automatic life sentencing provision of the Texas capital sentencing framework is constitutional. *Allen v. State*, 552 S.W.2d 843, 847 (Tex. Crim. App. 1977) (holding that a mandatory life sentence for capital murder does not violate the constitutional right to trial by jury because that right does not extend to the assessment of punishment); *Murkledove v. State*, 437 S.W.3d 17, 30 (Tex. App.—Fort Worth 2014, pet. denied) ("Texas courts have consistently held that the mandatory life sentence required under section 12.31(a) of the penal code . . . is not unconstitutional as cruel and unusual punishment under the Eighth Amendment"); *Cienfuegos v. State*, 113 S.W.3d 481, 495-96 (Tex. App.– Houston 2003, pet. ref'd) (holding the imposition of automatic life sentence for conviction as a party to capital murder does not offend the Constitution); *Laird v. State*, 933 S.W.2d 707, 714-15 (Tex. App.—Houston

1996, pet. ref'd) (holding that the imposition of a mandatory life sentence for capital murder does not violate a defendant's due process rights).

Because the state court's decision was not an unreasonable application of *Strickland*, Petitioner is not entitled to habeas relief on this claim.

CONCLUSION

The Texas Court of Criminal Appeals' decision denying relief on the claims presented in Petitioner's federal habeas petition was not an unreasonable application of *Strickland* to those claims. Accordingly, Petitioner is not entitled to habeas relief on his ineffective assistance of counsel claims.

RECOMMENDATION

It is, therefore, recommended that Petitioner's Application for Writ of Habeas Corpus be **DENIED**.

CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's

constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's section 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is respectfully recommended that the Court shall not issue a certificate of appealability.

OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the

district court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-153 (1985);

*Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

SIGNED this 16th day of June, 2017.

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE